# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-00993-SCT

*LAMARCUS JONES a/k/a LAMARCUS ANTWAIN JONES a/k/a LAMARCUS A. JONES a/k/a L.A. JONES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2014 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | CHARLES W. WRIGHT, JR. |
| | FORREST ALLGOOD |
| | KATIE MOULDS |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES W. WRIGHT, JR. |
| | REBECCA TAFF WRIGHT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/11/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Marveo Lane was shot and killed in the early morning hours of August 2, 2008. Mareno Hubbard testified that Lamarcus Jones was the shooter. Jones was indicted for Lane's murder in 2010 and convicted in 2014. He received a life sentence. After Jones's conviction and sentence, Hubbard pled guilty to manslaughter and was given a sentence of

twenty years, with eight years suspended and credit for time served. Finding Jones's assignments of error to be unavailing, we affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     Between 11:00 p.m. and 12:00 a.m., the night and early morning of August 1 and 2, 2008, Mareno Hubbard visited the Q5 Club, a nightclub located on Cedar Creek Road near Macon, Mississippi. After conversing with various acquaintances both inside and outside the nightclub, Hubbard returned inside and ventured onto the dance floor. While so engaged, Hubbard encountered Lamarcus Jones, who expressed a desire to "holla at" Hubbard, meaning "he needed to let me know something that he know that I don't know."

¶3.     Hubbard and Jones then exited the building, whereupon Jones informed Hubbard that he (Jones) intended to "handle" someone, meaning he had a conflict with someone and needed "to get at" him. According to Hubbard, the guys from Baptist Hill were "into it," fighting, with the guys from Brooksville. Hubbard and Jones then walked behind the nightclub to a fence line on the side of the club and went through a hole in the fence. Then Jones "retrieved the guns out of the corner of the fence line." The weapons, according to Hubbard, were hidden "in the bushes in the tall grass area." According to Hubbard, Jones handed him a .25 caliber pistol and kept the larger caliber gun. Upon obtaining the guns, Hubbard assured Jones that he "had his back," thus indicating that he intended to participate. The pair then "crossed the ditch and came back around onto the club's premises. And then we walked through the same trail that we went through the fence line."

2

¶4.    With guns in hand, Hubbard and Jones moved to the right side of the club and approached a white car, a "Crown Vic." Hubbard testified that Jones walked to the driver's side of the car and that he remained behind the car in view of the rearview mirror. According to Hubbard, Jones then looked into the car "just to make sure it was the right guy." Jones took aim and fired at the car door, shattering the door's glass window. Lane, who was in the car, opened the car door and asked what was going on. At that point, according to Hubbard, Jones shot again, after which Lane drove away on Cedar Creek Road. Hubbard then fired a shot into the air, ostensibly to divert attention of the crowd from Jones. Hubbard and Jones then "took off running back [] toward the left of the club." They ran to Baptist Hill to Jones's grandmother's house. Hubbard and Jones then deposited the guns behind a dog house which was situated at the rear of the grandmother's house. Lane died of a massive internal hemorrhage which had resulted from a gunshot wound.

¶5.    Hubbard turned himself in on August 2, 2008, and was indicted for Lane's murder on September 22, 2008. Jones was named as a witness in the State's prosecution of Hubbard in a number of subpoenas from 2009 through 2014. On September 22, 2010, Hubbard gave a statement to Maurice Johnson, the investigator for the Noxubee County District Attorney's Office, in which he implicated Jones in the shooting of Lane.

¶6.    Jones was indicted for Lane's murder on September 23, 2010. He was tried on March 13, 2012. The first trial resulted in a mistrial, declared on March 15, 2012, because a juror's father passed away during the trial and no alternate juror was available. Jones's second trial began on September 24, 2012, and that, too, resulted in a mistrial because "a juror had failed

3

to answer a pertinent question on voir dire." One note from the jury foreman asked "[w]ould it be a conflict if a mother & son served on the same jury?" Another indicated that "[o]ne person keeps saying they need more evidence." On September 10, 2013, a third mistrial was declared, because a sufficient jury could not be impaneled, and trial was reset for March 24, 2014. On March 28, 2014, Jones was convicted of murder. He was sentenced to life imprisonment and ordered to pay a fine of $10,000, court costs, and "reasonable expenses of funeral and burial of Marveo Lane."

¶7.     On May 22, 2014, Hubbard pled guilty to manslaughter. He was sentenced that day to twenty years, with eight years suspended and twelve years to serve with credit for the six years he already had served.

¶8.     On appeal, Jones raises five issues.

## ANALYSIS

**1.      Whether the verdict was against the overwhelming weight of the evidence.**[1]

¶9.     Jones claims on appeal that the jury verdict amounted to an unconscionable injustice and should be set aside because Hubbard's testimony that Jones had been the shooter was motivated by Hubbard's desire for a reduced charge and sentence.

¶10.   This Court has held that:

---

[1]In the "Summary of the Argument" section of Jones's brief, Jones states that "there was insufficient evidence to support the guilty verdict against him . . . ." But Jones substantiates only the argument that the verdict in this case was against the overwhelming weight of the evidence. Accordingly, this Court declines to address Jones's sufficiency argument. "'The [appellant's f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues.'" **Batiste v. State**, 121 So. 3d 808, 861 (Miss. 2013) (quoting **Simmons v. State**, 805 So. 2d 452, 487 (Miss. 2001)).

We will only disturb a jury verdict when "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 [(Miss. 2005)] (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). This Court acts as a "thirteenth juror" and views the evidence in the light most favorable to the verdict. *Bush*, 895 So. 2d at 843 (citing *Herring*, 691 So. 2d at 957). . . .

*Blanchard v. State*, 55 So. 3d 1074, 1079 (Miss. 2011) (quoting *Harris v. State*, 970 So. 2d 151, 156 (Miss. 2007)).

¶11.    It is true, as Jones relates, that "the only person to testify that Lamarcus Jones was the person who shot Marveo Lane was Mareno Hubbard." Jones argues that Hubbard lacked credibility because he was motivated to lie to obtain a reduced charge and sentence recommendation from the district attorney. We have held, however, that "'[t]he uncorroborated testimony of an accomplice may be sufficient to convict an accused . . . . [This] rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory or substantially impeached.'" *Osborne v. State*, 54 So. 3d 841, 846 (Miss. 2011) (quoting *Ballenger v. State*, 667 So. 2d 1242, 1253 (Miss. 1995)). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Osborne*, 54 So. 3d at 847 (citing *Mangum v. State*, 762 So. 2d 337, 342 (Miss. 2000)). "The testimony that must be corroborated is the part connecting the defendant to the crime." *Osborne*, 54 So. 3d at 847 (citing *Holmes v. State*, 481 So. 2d 319, 322 (Miss. 1985)). "If the testimony is not corroborated, a cautionary jury instruction is required." *Osborne*, 54 So. 3d at 847 (citing *Williams v. State*, 32 So. 3d 486, 491 (Miss. 2010)).

¶12.    Here, Jones claims that Hubbard's testimony was "'unreasonable, self-contradictory or substantially impeached.'" *Osborne*, 54 So. 3d at 846 (quoting *Ballenger*, 667 So. 2d at

1253). He points to Jones's statement, in which Jones claimed Hubbard had been the shooter. Jones's statement was not admitted at trial and Jones did not testify. He also points to the statement of defense witness Retina Stallings, in which she related that Hubbard had said at the Q5 that he was going to Brooksville, Mississippi, for the purpose of killing someone. Stallings indicated further that she heard gun shots and "saw Mareno take off running toward the woods" but that she "didn't actually see Mareno pull the trigger . . . ." Her statement was marked for identification purposes but was not admitted into evidence. Stallings's trial testimony was consistent with her statement that she had not seen who shot Lane.

¶13.    Further, Jones cites some "inferences and consistencies [sic]" in Hubbard's testimony. According to Jones, Hubbard testified that Jones had used his left hand to fire into Lane's vehicle, but that Hubbard, himself, was left handed. Hubbard testified that he intended to run "a whole another direction," but that he had followed Jones through the crowd instead. According to Jones, "[t]he inference could be drawn that Mareno Hubbard was going to run away from the crowd and run into the woods to hide to keep from being identified as the shooter of Marveo Lane" and "[a]n inference could also be drawn that an innocent man would run toward the crowd and away from where a man was being shot when he has nothing to hide." Finally, Jones cites a discrepancy in the testimony of Hubbard versus the statement he gave regarding how he and Jones had obtained the guns. In the written statement Hubbard gave to police, he said that Jones had pulled the guns out of his shirt. At trial, however, Hubbard testified that the guns had been hidden in some bushes behind the club.

¶14. The State responds by mentioning the evidence which corroborated Hubbard's testimony. Tissia Graham, who testified for the State, observed Hubbard and Jones walk past her with guns in hand. She heard three gunshots, after which a white car exited the parking lot, and the pair walked back by "very quickly." Graham did not, however, see who had fired the shots. State's witness Tommy Orr likewise observed Hubbard and Jones walking past him with guns, heard gunshots, and observed the two men walking away from the club "faster." The testimony of Marcus Smith, another State's witness, was consistent with that of Graham and Orr.

¶15. Jones is correct that Hubbard's testimony that Jones was the shooter was not corroborated. None of the witnesses observed which of the pair was the shooter. But it cannot be said that Hubbard's testimony was "'unreasonable, self-contradictory or substantially impeached.'" *Osborne*, 54 So. 3d at 846 (quoting *Ballenger*, 667 So. 2d at 1253).The testimony adduced at trial corroborated Jones's participation in the murder of Lane. *See Osborne*, 54 So. 3d at 847 (citing *Holmes*, 481 So. 2d at 322).

¶16. It is ultimately the jury's role to "weigh witness testimony and determine its credibility." *Osborne v. State*, 54 So. 3d 841, 846 (Miss. 2011) (citing *Massey v. State*, 992 So. 2d 1161, 1163 (Miss. 2008)). The jury here evaluated the evidence and determined Jones was guilty as charged. The evidence adduced at trial supported the jury's finding and the verdict was not "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So.2d at 844 (citation omitted).

¶17.    This issue is without merit.

> **2.      Whether the trial court's failure to require the State to disclose a deal it allegedly had made with Hubbard resulted in Jones's inability to place his theory of defense before the jury.**

¶18.    Jones argues that the State's assurances that no promise of leniency in exchange for testimony implicating Jones in Lane's murder prevented him from cross examining Hubbard about the purported plea deal. Following Jones's conviction and sentence in March 2014, Hubbard pled guilty to manslaughter on May 22, 2014, and, on the State's recommendation, was sentenced to twenty years, with eight years suspended and twelve years to serve, with credit for the six years he already had served. This "newly discovered evidence," according to Jones, corroborates the existence of "an unwritten, undisclosed plea bargain" and undermines confidence in the jury verdict.

¶19.    In *Giglio v. United States*, the United States Supreme Court considered whether the government was required to disclose to the defendant the existence of a "promise made to its key witness that he would not be prosecuted if he testified for the Government." *Giglio v. United States*, 405 U.S. 150, 150-51, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). An affidavit confirmed that if the witness, Giglio's alleged coconspirator, "testified before the grand jury and at trial he would not be prosecuted." *Id.* at 152. The Court held that, because "[t]he Government's case depended almost entirely on [the witness's] testimony" and because "without it there could have been no indictment and no evidence to carry the case to the jury," the witness's credibility "was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his

8

credibility and the jury was entitled to know of it." *Id.* at 154-55. The Court reversed

Giglio's conviction and remanded for a new trial. *Id.* at 155.

¶20.    In *King v. State*, this Court considered a case in which a codefendant gave testimony

which implicated the defendant in a murder for which she was convicted. *King v. State,* 363

So. 2d 269, 270 (Miss. 1978). The defense sought pretrial disclosure of any agreement and,

during the trial, moved to exclude the witness's testimony "because it was believed he had

been promised immunity by the state which had not been divulged to the defendant although

requested." *Id.* at 273. The Circuit Court of Clay County stated on the record that it was

"aware of immunity being granted to [the witness] in this case" and found that "such simply

goes to the credibility of the witness to be brought out by cross examination." *Id.* at 273. "It

was established that [the witness] had been granted immunity several months before the trial

with the concurrence of the trial judge and that the attorneys who participated in the

immunity negotiations were directed by the judge not to disclose such fact." *Id.* at 273-74.

¶21.    This Court reversed and remanded on the basis of *Giglio*. *Id.* at 275. The Court stated

that:

> The testimony of [the witness], whether true or untrue, was purchased by a grant of immunity, specifically, freedom from life imprisonment. We, of course, do not know what effect the grant of freedom had upon his testimony, but the potential of its affecting the witness's credibility is so great that it cannot be ignored. A jury always has great responsibility in resolving factual disputes and its responsibility in cases of this nature is awesome. It needs, and the courts must afford, every proper assistance to the jury in its search for the truth. Essential to this effort is knowledge of the inducements likely to affect the witness's credibility so it may be considered by the jury in its deliberations.

9

*Id.* at 274. The Court continued that "[a] witness's credibility is of such importance in our system of justice that all courts recognize the great need for, and grant, broad scope upon cross-examination, but even then at times, regardless of the skillfulness of the cross-examination, essential facts, regretfully, do not come to the jury's attention." *Id.*

¶22.    This Court, likewise, in *Barnes v. State*, held that " a leniency/immunity agreement may be presented to the jury where such would tend to impeach or show bias in the testimony of a State's witness." *Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984). This Court reversed and remanded because the trial court declined to allow Barnes to cross examine his codefendant's lawyer regarding the agreement. *Id.* at 131. And in *Morgan v. State*, the State on appeal conceded that a witness had been granted immunity from prosecution. *Morgan v. State*, 703 So. 2d 832, 840 (Miss. 1997). This Court reaffirmed "that reversible error results when evidence of an immunity agreement between the State and its key witness is removed from the jury's consideration." *Id.* at 841 (citations omitted).

¶23.    In all of the cited cases, evidence existed of the State's promise of leniency to the witness in exchange for the witness's testimony. Here, the record is devoid of any indication of a promise of leniency to Hubbard in exchange for testimony implicating Jones in the crime. Hubbard responded in the negative when asked whether any deal had been made with the district attorney's office in exchange for testimony. The district attorney asked whether Hubbard expected any consideration for his testimony, and Hubbard responded that he was willing to "take the time for whatever I did. You know, but I'm not the shooter. I didn't shoot

Mr. Lane. I can do my own time. I just want him to hold up for what he did instead of trying to shift all of the blame on me."

¶24. And the record does not indicate that the trial court disallowed any questioning by defense counsel in its cross examination of Hubbard regarding the existence of a plea agreement. Hubbard informed the jury that he, too, had been charged with murder. And the following colloquy occurred:

> Q: Now, when you indicate that you're hoping for some type of benefit, can you tell the jury what benefit you're hoping for?
>
> A: I mean whatever the time is for the principal that I played, the part that I actually assisted him in this, I mean whatever it is, I've got to hold up for it.
>
> Q: The truth is, the benefit that you're looking for is something like time served. Isn't that true?
>
> A: No. That's your idea.

Defense counsel was able to get before the jury its theory that the State's promise to Hubbard was that he would be sentenced to the amount of time he already had served. The jury rejected it.

¶25. This issue is without merit.

**3. Whether the trial court erred by denying Jones's proposed jury instructions.**

*Accomplice Instruction*

¶26. Jones argues that the trial court erred in denying two of his proposed jury instructions. The first, Instruction D-25, would have informed the jury as follows:

11

> The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged accomplice or informant, and requires the jury to weigh that testimony with great care and suspicion. You should weigh the testimony from an alleged accomplice or informant, and [in] passing on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.

The trial court refused Instruction D-25 in favor of Instruction S-4, which had been proposed by the State. That instruction stated the following:

> The Court instructs the Jury that a witness called by the State, Mereno [sic] Hubbard, is an alleged accomplice in this case. The Court has already instructed you that you, as jurors, are the sole judges of the weight and credibility to be assigned to the testimony and supporting evidence of each witness who has testified in this case. However, since Mereno [sic] Hubbard is an alleged accomplice, any testimony of Mereno [sic] Hubbard which you find uncorroborated by other evidence should be viewed with great caution and suspicion *if you find such uncorroborated testimony to be unreasonable, self-contradictory, or substantially impeached.*

(Emphasis added.) Jones argues that Instruction S-4 "essentially called upon the jury to decide and make a finding as to whether alleged accomplice Hubbard's testimony was corroborated by other evidence; and upon finding said testimony was uncorroborated, decide whether the uncorroborated testimony was also unreasonable, self-contradictory, or substantially impeached."

¶27.   This Court has held that, "'[d]efendants are entitled to have instructions on their theory of the case presented to the jury for which there is foundation in the evidence, even though the evidence might be weak, insufficient, inconsistent or of doubtful credibility . . . .'" *Alexander v. State*, 749 So. 2d 1031, 1037 (Miss. 1999) (quoting *Welch v. State*, 566 So. 2d 680, 684 (Miss. 1990)). "'Clear law in the State of Mississippi is that the jury is to regard the testimony of co-conspirators with great caution and suspicion.'" *Williams v. State*, 32 So.

12

3d 486, 490 (Miss. 2010) (quoting *Derden v. State*, 522 So. 2d 752, 754 (Miss. 1988)). "When determining whether a defendant is entitled to such a cautionary instruction, the trial judge considers whether the witness was in fact an accomplice and whether the witness's testimony was corroborated." *Williams*, 32 So. 3d at 490 (citing *Brown v. State*, 890 So. 2d 901, 910 (Miss. 2004)).

¶28.    In *Williams*, this Court rejected the State's argument that "the accomplice's testimony must be 'self-contradictory' or 'substantially impeached' to warrant a cautionary instruction." *Williams*, 32 So. 3d at 491. This Court held that "for a defendant to be entitled to a cautionary instruction, it is only necessary that the accomplice's testimony be uncorroborated." *Id.* (citing *Brown v. State*, 682 So. 2d 340, 344 (Miss. 1996)). In *Williams*, however, this Court was not considering the content of the cautionary accomplice jury instruction, but the defendant's entitlement to it.

¶29.    This Court has held repeatedly that "a conviction may be supported by the testimony of an accomplice, even when it is uncorroborated . . . . We only require that the accomplice's testimony be reasonable and not improbable, self-contradictory or substantially impeached." *Winters v. State*, 449 So. 2d 766, 771 (Miss. 1984) (citing *Mason v. State*, 429 So. 2d 569 (Miss. 1983); *Pearson v. State*, 428 So. 2d 1361, 1363 (Miss. 1983)). *See Catchings v. State*, 394 So. 2d 869, 870 (Miss. 1981) (testimony of accomplice "should be viewed with great caution and suspicion and must be reasonable, not improbable, self-contradictory or substantially impeached."); *Moody v. State*, 371 So. 2d 408, 410 (Miss. 1979) (same); *Jones v. State*, 368 So. 2d 1265, 1267 (Miss. 1979) (same); *Simpson v. State*, 366 So. 2d 1085,

13

1086 (Miss. 1979) (same); *Thomas v. State*, 340 So. 2d 1, 2 (Miss. 1976) (same); *Black v. State*, 336 So. 2d 1302, 1303 (Miss. 1976) (same); *Hutchins v. State*, 220 So. 2d 276, 278 (Miss. 1969) (same); *Cole v. State*, 217 Miss. 779, 785, 65 So. 2d 262, 264 (1953) (same); *Creed v. State*, 179 Miss. 700, 176 So. 596, 597 (1937) (same).

¶30.   This Court pointed out in *Williams* that many of the cases standing for the proposition cited above refer to "the test for whether the uncorroborated testimony of an accomplice is sufficient to support a conviction, not whether a cautionary instruction is required." *Williams*, 32 So. 3d at 491. *See Ballenger*, 667 So. 2d at 1253 (citations omitted) ("the general rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory, or substantially impeached.") In *Williams*, this Court reversed and remanded, holding that the trial court had erred by failing to grant the defendant's requested "cautionary jury instruction regarding the uncorroborated testimony of his co-defendants." *Williams*, 32 So. 3d at 492.

¶31.   Presiding Justice Carlson, who authored a special concurrence in *Williams* which was joined by a majority of this Court, proposed a jury instruction identical to the one given in the present case: "[S]ince John Doe is an accomplice in this case, any testimony of John Doe which you find to be uncorroborated by other evidence should be viewed with great caution and suspicion if you find such uncorroborated testimony to be unreasonable, self contradictory, or substantially impeached." *Williams*, 32 So. 3d at 494 (Carlson, P.J., specially concurring). Presiding Justice Carlson suggested that this instruction be employed

14

"if there is any doubt at all as to whether the testimony of the accomplice is uncorroborated."

*Id.*

¶32.    In *Smith v. State*, this Court held that a cautionary accomplice jury instruction "must inform the jury that an accomplice's testimony *which is uncorroborated by other evidence* must be viewed with great caution and suspicion." *Smith v. State*, 907 So. 2d 292, 298 (Miss. 2005) (citations omitted) (emphasis in original). In that case, this Court was concerned with a proposed defense instruction which informed the jury that "an accomplice's testimony must '*always* be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.'" *Smith*, 907 So. 2d at 297-98 (emphasis in original). We held that "[t]he testimony of an accomplice is not required to be viewed with great caution and suspicion just because he is an accomplice, but instead it is only that portion of an accomplice's testimony which is uncorroborated by other evidence which is viewed with great caution and suspicion." *Id.* at 298. We found that "the jury instruction . . . properly stated that if the jury found the testimony of the alleged accomplice to be uncorroborated by other evidence, then the jury should view his testimony with great caution and suspicion."

*Id.*

¶33.    But, as we held in *Williams*, the defendant's *entitlement* to a cautionary accomplice jury instruction hinges upon the existence of corroboration. *Williams*, 32 So. 3d at 491 (citing *Brown*, 682 So. 2d at 344). If a cautionary accomplice instruction is sought by the defendant, it ~~It~~ is the trial court's responsibility, based on whether or not the accomplice's testimony is corroborated, to determine whether the defendant is entitled to have a cautionary

15

accomplice instruction given to the jury. The defendant is entitled to a cautionary instruction if the trial court finds that the testimony of the accomplice is uncorroborated. The jury must then, after having been instructed to view such testimony with caution and suspicion, determine which portions of the accomplice's testimony, if any, it deems credible. Those portions of the accomplice's testimony the jury does not deem worthy of belief should be disregarded.

¶34.   As discussed above, we have considered the standard trial courts are to apply when determining whether a defendant is entitled to a cautionary accomplice jury instruction and the standard trial courts are to apply when considering evidentiary sufficiency. However, the jury instruction proposed in the special concurrence in *Williams* and employed by the trial court in this case erroneously conflates the standards. For the jury is not charged—as is the trial court—with making a *legal* determination of the sufficiency of the evidence. Rather, it is the jury's duty to assess the guilt of the accused by weighing evidence after having properly been instructed on the applicable law. Juries are to be instructed to consider the testimony of accomplices with great caution and suspicion if the trial court first determines that the testimony is uncorroborated. *See Williams*, 32 So. 3d at 491. It remains the trial court's task to determine, upon a motion to dismiss or a motion for judgment notwithstanding the verdict, to assess the sufficiency of the evidence, i.e., whether uncorroborated accomplice testimony is unreasonable, self contradictory, or substantially impeached such that the conviction is undermined.

16

¶35.	The standards having been clarified, we approve the use of the following accomplice jury instruction:

> During the course of his testimony in this trial, the witness John Doe claimed to have participated with the defendant in [the crime for which the defendant is on trial]. Doe is an admitted accomplice, and, as such, the jury should consider his testimony with great caution and suspicion. The jury is the sole judge of the credibility and the believability of all the witnesses, and it is for the jury to decide how much weight and worth, if any, to give the testimony of the witnesses, including Doe. As you consider Doe's testimony, you may accept such portions, if any, that you deem credible, and reject such portions, if any, that you do not deem worthy of belief.

The above instruction is to be given in future cases upon the trial court's determination that the accomplice's testimony was uncorroborated. *See Williams*, 32 So. 3d at 491.

¶36.	The jury instruction which was given in this case is different from Jones's proposed Instruction D-25, which states only that jurors are to view "with distrust and suspicion" the testimony of an accomplice. We hold that the trial court erred in instructing the jury that, in order to disregard the accomplice's testimony, first it had to find the testimony to be uncorroborated and, second that it had to find the accomplice testimony to be unreasonable, self-contradictory, or substantially impeached.[2] We clarify that those standards are legal determinations for the trial court to make in determining, first, whether to grant the

---

[2] The opinion concurring in result would decline to "hold the trial court in error, even harmless error, for doing exactly what a majority of this court suggested" in Presiding Justice Carlson's special concurrence in *Williams*. But reversal is a proper remedy when the trial court has incorrectly instructed the jury, which we find to have been the case here: "'Where the jury had incorrect or incomplete instructions regarding the law, our review task is nigh unto impossible and reversal is generally required.'" *Rogers v. State*, 95 So. 3d 623, 632 (Miss. 2012) (quoting *Henderson v. State*, 660 So. 2d 220, 222 (Miss. 1995)).

17

cautionary accomplice instruction and, second, whether to grant or deny a motion for a directed verdict and/or a motion for a judgment notwithstanding the verdict.

¶37. We find, however, that any error in so instructing the jury was harmless, given that Hubbard's uncorroborated testimony established only that Jones was the shooter. Other eyewitness testimony corroborated that Jones had participated in Lane's killing prior to and after the shooting, regardless of which participant in the crime pulled the trigger. According to the proof presented, a reasonable jury could find that both Jones and Hubbard were principals.

¶38. Presiding Justice Dickinson finds cautionary accomplice jury instructions to be analogous to flight instructions and warns that "[b]oth are troubling examples of a trial judge improperly intervening in the jury's exclusive province," thus having "no place in our justice system." As Presiding Justice Dickinson notes, "[f]light instructions tell jurors that they may infer 'guilty knowledge' from flight—in essence, instructing jurors that they may infer that defendants are guilty of the crime of which they are accused, merely from the evidence of his or her flight." Accomplice instructions should not be painted with the same brush as flight instructions because instructing a jury that it may infer an element of a crime from the defendant's flight is different from a trial judge's cautioning jurors with respect to their consideration of the testimony of an admitted accomplice.

¶39. Without reference to any evidence that support his theory, Presiding Justice Dickinson opines that "accomplice instructions pose an unfair risk that some jurors will completely disregard a witness's testimony, not based on the witness's credibility, but because they were

18

instructed to 'regard it with caution and suspicion.'" Such risk, if any, is addressed in the accomplice instruction above, which informs the jury that it is entitled to " accept such portions, if any, that you deem credible, and reject such portions, if any, that you do not deem worthy of belief." And we have held that, "[i]t is presumed that the jury follows the instructions of the trial court." **Hobson v. State**, 730 So. 2d 20, 25 (Miss. 1998) (citing **Johnson v. State**, 475 So. 2d 1136, 1142 (Miss. 1985)). The importance and the efficacy of accomplice instructions has long been recognized by this Court and Presiding Justice Dickinson provides no good reason for their abandonment.

*Prior Inconsistent Statement Instruction*

¶40.    Jones next argues that the trial court erred in denying his proposed instruction, Instruction D-26, which stated the following:

> You have heard evidence that Mareno Hubbard made a statement prior to trial that may be inconsistent with the witness'[s] testimony at this trial. If you believe that an inconsistent statement was made, you may consider the inconsistency in evaluating the believability of the witness'[s] testimony.

¶41.    Entitlement to a jury instruction hinges upon the existence of a foundation in the evidence that supports it. **Alexander**, 749 So. 2d at 1037. Jones does not point to evidence in the record which supports the giving of an impeachment instruction regarding a prior inconsistent statement. In **Ferrill v. State**, this Court held that it was improper for the trial court to refuse an impeachment instruction similar to the one requested by Jones because, apart from the witness's testimony, "there was little concrete evidence" which implicated defendants in the charged crime and the witness had given a prior inconsistent statement. **Ferrill v. State**, 643 So. 2d 501, 504-05 (Miss. 1994). The accomplice's prior statement in

19

*Ferrill* had indicated that the defendants had not participated in the crime and that they had "no involvement whatsoever with the case for which I am charged." *Id.* at 503.

¶42.	In another section of his brief, Jones cites a discrepancy in the testimony of Hubbard versus the statement he gave to police regarding how he and Jones had acquired the guns. In the statement Hubbard gave to police, he indicated that Jones had pulled the guns out of his shirt. At trial, however, Hubbard stated that he and Jones had procured the guns from some bushes behind the club. Defense counsel asked Hubbard about the discrepancy on cross examination. Hubbard admitted that he had lied to police about Jones pulling the guns from underneath his shirt "to keep us from being charged with premeditated murder. Because I ain't planned nothing." Jones's counsel highlighted this inconsistent statement in his closing argument.

¶43.	In *Swann v. State*, this Court found that the refusal of a proposed impeachment instruction would have been erroneous "if no other instructions regarding the believability of [the accomplice's] testimony were provided to the jury." *Swann v. State*, 806 So. 2d 1111, 1117 (Miss. 2002). The Court affirmed, first because "[t]he jury did hear other instructions regarding the credibility of the witnesses and the consideration of conflicts in their testimony." *Id.* This Court has held that "'[a] [trial] court must view jury instructions as a whole, and not individually, in order to decide whether the jury was adequately instructed.'" *Id.* (quoting *Chatman v. State*, 761 So. 2d 851, 855 (Miss. 2000)). "Furthermore, a trial judge is not under an obligation to grant redundant instructions." *Swann*, 806 So. 2d at 111 (citing *Davis v. State*, 568 So. 2d 277, 280-81 (Miss. 1990)). The Court affirmed, second,

because the defendant "had the opportunity to cross-examine [the accomplice] regarding her prior inconsistent statements and, as evidenced by the record, [defendant's] attorney did so." *Swann*, 806 So. 2d at 1117. Finally, "[defendant] also argued in closing that [accomplice] was untrustworthy . . . and had given several inconsistent statements." *Id.*

¶44.    Instruction C-01 informed the jury that its "exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case." Furthermore, defense counsel thoroughly questioned Hubbard regarding his prior inconsistent statement and emphasized it to the jury in his closing argument.

### 4.    Whether the trial court erred by admitting testimony that Detective Grasseree never received the evidence from the Mississippi Crime Lab.

¶45.    Jones objects, for the first time on appeal, to testimony relating to physical evidence, specifically, a bullet and spent shell casing, which disappeared after having been retrieved from the Mississippi Crime Laboratory ("Crime Lab.")

¶46.    Noxubee County Sheriff Terry Grassaree, who, at the time of the crime was Chief Deputy Sheriff of Noxubee County, testified that he had delivered the bullet found inside Lane's car and the spent casing found on the grounds of the Q5 Club to the Mississippi Crime Lab. He testified that when, during a term of court, the evidence was needed, "we went down to look for it and couldn't find" it. Sheriff Grassaree was informed that "the sheriff's department didn't pick it up. It was Darold Mitchell with the Macon police

21

department who picked it up." No objection was forthcoming, and Sheriff Grassaree was cross examined regarding Darold Mitchell of the Macon Police Department.

¶47. Mitchell testified as a witness that Jones was his nephew. Mitchell denied purposely discarding the evidence, stating that he was "scared of two places . . . jail and hell." He testified that he had given the evidence to Sheriff Grassaree, who had deposited it "in the trunk of his car." When the State called Sheriff Grassaree as a rebuttal witness, he testified that he never had received evidence from the Crime Lab from Mitchell.

¶48. Jones claims that this testimony was elicited by the prosecution "to suggest to the jury that Office [sic] Mitchell disposed of evidence that would inculpate the appellant, Lamarcus Jones," his relative. Jones claims that the evidence is irrelevant and that it is inadmissible because it suggests the existence of an uncharged crime.

¶49. This Court has held that, "'[i]n order to preserve an issue for appeal, counsel must object. The failure to object acts as a waiver.'" *Jackson v. State*, 174 So. 3d 232, 236 (Miss. 2015) (quoting *Havard v. State*, 928 So. 2d 771, 791 (Miss. 2006)). That said, "'[i]n extreme cases, a failure to object to questions which were violative of a constitutional right will not act as a procedural bar to consideration." *Jackson*, 174 So. 3d at 237 (quoting *Ross v. State*, 954 So. 2d 968, 1002 (Miss. 2007)).

¶50. "All relevant evidence is admissible . . . ." Miss. R. Evid. 402. "'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. In *Burleson v. State*, this Court held that a gun which was

not used in the commission of the murder was relevant in Burleson's murder trial and that the trial court had not abused its discretion in admitting it into evidence. ***Burleson v. State***, 166 So. 3d 499, 508 (Miss. 2015). Here, the State correctly asserts that the testimony explaining the absence of the bullet and spent shell casing was relevant in a murder case in which the victim was killed by bullet wounds. Moreover, the State never suggested that Mitchell and Jones had conspired to discard the evidence.

¶51.    This issue is procedurally barred and, procedural bar notwithstanding, meritless.

> **5.    Whether the trial court erred by admitting the rebuttal testimony of Tina Holcombe-Ferrell, which called into question the truth and veracity of defense witness Retina Stallings.**

¶52.    Retina Stallings was called as a witness to testify on behalf of Jones. She testified that Hubbard had a gun in his pants when she saw him at the Q5 on August 2, 2008, that he told her he had a problem with someone and he planned to handle it,[3] and that, after hearing gunshots, she exited the Q5 and observed Hubbard running toward the bushes. On cross-examination, Stallings was asked about her life in 2008. She testified that she had frequented nightclubs, used drugs (marihuana and pills), and had her children taken from her. She testified that she did not "really remember a whole lot about 2008."

¶53.    After the defense had rested, the State called Tina Holcombe-Ferrell as a rebuttal witness, over the objection of defense counsel. Her testimony was as follows:

Q.    Okay. I have five questions for you. Do you know Retina Stallings?

A.    I do.

---

[3] Stallings's statement indicated that Hubbard had said he was going to Brooksville, Mississippi, to kill someone.

Q. Do you know the community in which she lives?

A. I do.

Q. Do you know her reputation for truth and voracity [sic]?

A. I do.

Q. Is that reputation a good reputation or a bad reputation?

A. It's a bad reputation.

Q. Would you believe Retina Stallings if she testified under oath?

A. No, I would not.

On cross examination, defense counsel elicited that Holcombe-Ferrell had been appointed as Hubbard's lawyer in 2008. On redirect, the State asked whether Holcombe-Ferrell was Hubbard's only lawyer and she responded that the other public defender in Noxubee County, Shane Tompkins, also represented Hubbard and that Tompkins was "the main one doing all of the legal representation."

¶54. Jones claims that, because Hubbard was charged with the same murder and because Hubbard was the only witness who testified that Jones had shot and killed Lane, that "[b]y allowing his attorney to testify to the truthfulness of one of the defense's main witnesses against her client . . . the Court allowed Mareno Hubbard to effectively stand up through his court appointed attorney" and attack Stallings's credibility. Jones next argues, regarding the cross examination of Stallings[4] which occurred prior to Holcombe-Ferrell's testimony as a rebuttal witness, that "[b]y asking questions concerning Ms. Stallings' past drug use, her

---

[4] Cross examination of Stallings was met with no objection by defense counsel.

24

drinking, going to night clubs, losing custody of her children, and her rehabilitation, the prosecution attempted to impeach Ms. Stallings' character." According to Jones, allowing Holcombe-Ferrell to impeach Stallings allowed the State "two bites at the apple." Jones cites *Brent v. State*, 632 So. 2d 936 (Miss. 1994), to argue that the trial court erred in failing to conduct a balancing test under Mississippi Rule of Evidence 403 and that the trial court erred by allowing Holcombe-Ferrell to testify regarding Stallings's reputation for truthfulness.

¶55.    Mississippi Rule of Evidence 608(b) provides the following:

> *Specific instances* of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness . . . may not be proved by *extrinsic evidence*. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

M.R.E. 608(b) (emphasis added). *See Brent*, 632 So. 2d at 944. The Court in *Brent* clarified that "when a party seeks to cross-examine a witness about specific instances of past conduct probative of veracity under Rule 608(b) that the judge make his findings under Rule 403 of record." *Brent*, 632 So. 2d at 945. "Our ability to accord deference to the trial court's discretion in either permitting or denying such Rule 608(b) cross-examination rests upon specific findings of the trial court of it's [sic] weighing process under Rule 403." *Id.* Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Miss. R. Evid. 403. This Court laid out a procedural framework for questioning about specific instances of conduct:

Procedurally, before counsel attempts an inquiry on cross-examination as to specific acts of past conduct not resulting in conviction he should inform the trial judge that he intends to do so. The trial judge can then conduct a hearing outside the presence of the jury. It should be emphasized that Rule 608(b) does not authorize a fishing license, but counsel must have specific instances of past conduct about which he proposes to cross-examine the witness, and inform the trial judge of them. Following this, the trial judge can determine first if the conduct reflects upon the witness's honesty, and if so, weigh the probative value against the danger of unfair prejudice, as required under Rule 403 and also determine whether admission of the evidence will advance the ascertainment of the truth in the case.

*Id.*

¶56. Here, Holcombe-Ferrell was not questioned about specific instances of Stallings's past conduct. She specifically was asked about Stallings's reputation in the community for truth and veracity. Stallings herself was questioned about specific instances of conduct, but defense counsel did not object. "[I]ssues not presented to the trial court are procedurally barred on appeal." *Debrow v. State*, 972 So. 2d 550, 553 (Miss. 2007) (citing *Williams v. State*, 794 So. 2d 181, 187 (Miss. 2001)). Furthermore, the "extrinsic evidence prohibition of Rule 608(b) bars the use of any kind of evidence, including documents or the testimony of *other witnesses*, *except a direct admission* by the witness being cross-examined." Miss. R. Evid. 608(b) cmt. (emphasis added). Stallings's testimony was a direct admission by her and did not involve the presentation by the State of extrinsic evidence to prove specific instances of her past conduct.

¶57. Jones also claims that the trial court erred in allowing Holcombe-Ferrell to testify regarding Stallings's reputation as to truthfulness because of the following language from *Brent*:

Finally, it should be noted that the party cross-examining a witness about past instances of conduct is bound by the witness's answer. He is not permitted to offer evidence in rebuttal to contradict it. *U.S. v. Johnson*, 968 F.2d 765, 766-67 (8th Cir.), *cert. denied* 506 U.S. 980, 113 S. Ct. 481, 121 L. Ed. 2d 386 (1992); *U.S. v. Leonardi*, 623 F.2d 746, 757 (2d Cir.), *cert. denied* 447 U.S. 928, 100 S. Ct. 3027, 65 L. Ed. 2d 1123 (1980); *U.S. v. Rabinowitz*, 578 F.2d 910, 912 (5th Cir.1978); *Hayes v. U.S.*, 407 F.2d 189, 193-94 (5th Cir.), *cert. dismissed* 395 U.S. 972, 89 S. Ct. 2133, 23 L. Ed. 2d 777 (1969); *Peel v. U.S.*, 410 F.2d 1141-42 (5th Cir.1969).

*Brent*, 632 So. 2d at 945. Jones argues that *Brent* disallowed the State's calling Holcombe-Ferrell as a rebuttal witness after Stallings had been cross examined. But the State did not offer Holcombe-Ferrell for the purpose of contradicting what it had elicited from Stallings about past instances of conduct. The State elicited from Stallings that, in 2008, she had frequented nightclubs, used drugs (marihuana and pills), and had her children taken from her. The State then elicited from Holcombe-Ferrell that Stallings had a bad reputation for truth and veracity in the community.

¶58.    Finally, Jones argues that "when you look at the accumulative [sic] effect of these errors, then it becomes readily apparent that the verdict against Mr. Jones was based on bias and prejudice and tainted to such an extent that the verdict should be set aside and a new trial granted." The cumulative error doctrine provides that "where one error, standing alone, may not warrant reversal, reversal may be required if the errors, taken together, 'create such an atmosphere of bias, passion, and prejudice that they effectively deny the defendant a fundamentally fair trial.'" *Dickerson v. State*, 175 So. 3d 8, 35 (Miss. 2015) (quoting *Flowers v. State*, 158 So. 3d 1009, 1075 (Miss. 2014)). But in the absence of individual errors, there can be no cumulative error. *See Dickerson*, 175 So. 3d at 35.

27

¶59. The issue is without merit.

## CONCLUSION

¶60. The verdict was not against the overwhelming weight of the evidence. In the absence of evidence that Hubbard testified in exchange for a plea and sentence recommendation from the State, Jones's arguments that the trial court erred in failing to require the State to disclose the deal, and that he was prevented from developing his theory of defense, are without merit. While the jury was given an improper cautionary instruction regarding the testimony of the accomplice, we find such error was harmless. The trial court did not err in refusing Jones's requested Instruction D-26. Jones failed to object to testimony which explained missing evidence. Procedural bar notwithstanding, the trial court did not err in allowing the testimony. Finally, the trial court did not err in admitting Holcombe-Ferrell's rebuttal testimony concerning the defense witness Stallings's reputation for truth and veracity. We therefore affirm Jones's conviction and sentence.

¶61. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL PAY A FINE IN THE AMOUNT OF $10,000, ALL COSTS OF COURT, AND RESTITUTION FOR REASONABLE EXPENSES OF FUNERAL AND BURIAL OF MARVEO LANE. THESE AMOUNTS ARE TO BE PAID AT A RATE OF $200 PER MONTH BEGINNING SIXTY (60) DAYS UPON RELEASE FROM INCARCERATION.**

**WALLER, C.J., AND KING, J., CONCUR. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION. MAXWELL, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.; LAMAR, COLEMAN AND BEAM, JJ., JOIN IN PART. BEAM, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR AND COLEMAN, JJ.; RANDOLPH, P.J., AND MAXWELL, J., JOIN IN PART.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶62. While I agree with most of the majority's analysis and with the ultimate conclusion it reaches, I write separately to address the third issue raised by the appellant regarding accomplice cautionary instructions.

¶63. My view on accomplice instructions mirrors the view I expressed about flight instructions in **Burgess v. State**.[5] They not only are patently unnecessary and confusing, but they serve to usurp the jury's prerogative. Jurors already are instructed that they may draw reasonable inferences from the evidence presented,[6] and attorneys on both sides may present their arguments to the jurors as to what particular inferences they believe the jury should draw.[7] But in my view, accomplice instructions and flight instructions both improperly allow the trial judge to comment on the credibility to be assigned to certain evidence, thereby impermissibly influencing the jury's verdict.

¶64. Flight instructions tell jurors they may infer "guilty knowledge" from flight—in essence, instructing jurors that they may infer that defendants are guilty of the crime of which they are accused, merely from the evidence of his or her flight. I find it impossible to conclude that no juror would zero in on this instruction and bypass the State's ordinary burden to prove every element of the crime beyond a reasonable doubt.

---

[5] **Burgess v. State**, 178 So. 3d 1266, 1282–83 (Miss. 2015).

[6] **Flowers v. State**, 158 So. 3d 1009, 1081–82 (Miss. 2014) *vacated by* **Flowers v. State**, _ U.S. _, 136 S. Ct. 2157, _ L. Ed. 2d. _ (2016).

[7] **Pitchford v. State**, 45 So. 3d 216, 234–35 (Miss. 2010); **Goff v. State**, 14 So. 3d 625, 654 (Miss. 2009) (quoting **Bell v. State**, 725 So. 2d 836, 851 (Miss. 1998)).

¶65.    Accomplice instructions suggest that jurors "regard the testimony of co-conspirators with great caution and suspicion,"[8] thereby basically commanding the jury to disbelieve such testimony when credibility determinations are supposed to be left exclusively up to the jury. The jury alone should determine what weight, if any, to give to a witness's testimony, whether the witness is an accomplice or saint. These instructions improperly interfere with that process. Simply put, accomplice instructions pose an unfair risk that some jurors will completely disregard a witness's testimony, not based on the witness's credibility, but because they were instructed to "regard it with caution and suspicion."

¶66.    In sum, just as flight instructions are unfair and unnecessary, so too are accomplice instructions. Both are troubling examples of a trial judge improperly intervening in the jury's exclusive province. Consequently, they have no place in our justice system. Accordingly, like flight instructions, I believe this Court should abolish accomplice instructions altogether.

**MAXWELL, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶67.    I agree Jones's conviction should be affirmed. But I write separately because I disagree the trial judge erred by giving an instruction a majority of this court approved. I also disagree with the majority's newly crafted accomplice instruction. I would instead propose a simpler, more direct accomplice instruction.

¶68.    I first point out that I agree with the majority that the question of whether a defendant is "entitled" to an accomplice instruction *only* arises if the defendant *requests* an accomplice

---

[8] ***Williams v. State***, 32 So. 3d 486, 493 (Miss. 2010) (quoting ***Derden v. State***, 522 So. 2d 752, 754 (Miss. 1988)).

instruction. *See Williams v. State*, 32 So. 3d 486, 492 (Miss. 2010) (holding "the trial judge must accede *to the accused's request* and grant a cautionary jury instruction" when accomplice testimony is "the only evidence against the defendant" (emphasis added) (quoting *Holmes v. State*, 481 So. 2d 319, 322 (Miss. 1985))). This much is clear, since Mississippi law "does not impose upon a trial court a duty to instruct the jury sua sponte[.]" *Conner v. State*, 632 So. 2d 1239, 1254 (Miss. 1993). So only when such a request is denied do we ask on appeal if the lack of corroboration made it error for the trial court to refuse to give an accomplice instruction. *See Williams*, 32 So. 3d at 490; *Holmes*, 481 So. 2d at 322-23.

¶69. I do, however, strongly disagree with the majority holding the trial judge in error for giving the *exact instruction* a majority of this court approved in *Williams*. Maj. Op. ¶ 36. *See Williams*, 32 So. 3d at 494-95 (Carlson, P.J., specially concurring). If a majority of this court wants to supercede Presiding Justice Carlson's special concurrence in that case—which was joined by five other members of this court for a six-member majority—then so be it. But I fail to see how we can hold the trial court in error, even harmless error, for doing exactly what a majority of this court suggested.

¶70. Finally, I disagree with the majority's newly proposed instruction, which would require naming the accomplice (in four separate places)—a mandate with no basis in Mississippi law. This instruction also rehashes much of what is already given in most trial judges' general jury charge.

¶71. If this court finds our trial courts need a better pattern instruction than the one proposed in *Williams*, then I suggest the following simpler, more direct instruction:

31

> The testimony of an alleged accomplice must always be examined and weighed by the jury with greater caution and suspicion than the testimony of ordinary witnesses. You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.[9]

This instruction embodies the "[c]lear law in the State of Mississippi . . . that the jury is to regard the testimony of co-conspirators with great caution and suspicion." *Williams*, 32 So. 3d at 490 (quoting *Derden v. State*, 522 So. 2d 752, 754 (Miss. 1988). And it takes a straightforward approach to highlighting the circumstances that have led to the jury being cautioned—the uncorroborated testimony of an accomplice.

---

[9] This proposed instruction is a shortened version of the Fifth Circuit's Criminal Jury Instruction 1.14 (2001). The entire pattern instruction reads:

> The testimony of an alleged accomplice, and/or the testimony of one who provides evidence against a defendant as an informer for pay, for immunity from punishment, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by these circumstances, by the witness's interest in the outcome of the case, by prejudice against the defendant, or by the benefits that the witness has received either financially or as a result of being immunized from prosecution. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

The Fifth Circuit has cited this instruction with approval multiple times. *E.g.*, *United States v. Ordonez*, 286 F. App'x 224, 237 (5th Cir. 2008) (no error to instruct jury to consider unsupported testimony of an accomplice or co-conspirator with great care and not to convict on their unsupported testimony "unless you believe that testimony beyond a reasonable doubt"); *United States v. Zavala*, 541 F.3d 562, 578 (5th Cir. 2008); *United States v. Garcia Abrego*, 141 F.3d 142, 153 (5th Cir. 1998); *United States v. Go*, 847 F.2d 149, 161 n.13 (5th Cir. 1988); *United States v. D'Antignac*, 628 F.2d 428, 435 n.10 (5th Cir. 1980); *Wilkerson v. United States*, 591 F.2d 1046 (5th Cir. 1979) (approving an instruction that testimony of a co-conspirator must be weighed with caution).

32

¶72. For these reasons, I concur in part and in the result.

**RANDOLPH, P.J., JOINS THIS OPINION. LAMAR, COLEMAN AND BEAM, JJ., JOIN THIS OPINION IN PART.**

**BEAM, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶73. Respectfully, I concur in part and in result in the majority's opinion. I write separately to explain my reasoning.

¶74. At the outset, a cautionary accomplice instruction was not required in this instance. As the majority points out, much of alleged accomplice, Mareno Hubbard's testimony was materially corroborated by other evidence at trial. The record shows that two witnesses testified for the State that they saw both Jones and Hubbard enter the night club's parking lot together from the fence line located outside the club. Jones and Hubbard walked directly by where both witnesses were standing and both witnesses recognized Jones and Hubbard from their faces. Moments later, both witnesses heard gunshots. Immediately afterwards, both witnesses saw Jones and Hubbard exit the parking lot together at the fence line where the two had previously entered. According to one of the witnesses, Jones had a gun in his hand.

¶75. This evidence substantiated most of what Hubbard testified had transpired before and after the shooting. What was not corroborated was the portion of Hubbard's testimony claiming that Jones was the shooter–neither of the State's witnesses saw the shooting.

¶76. This, however, is of no moment in this instance because under the facts of this case, and under Mississippi's aiding and abetting law, both Hubbard and Jones could be held equally culpable for murder, regardless who actually shot the victim.

33

¶77. In jurisdictions, such as Mississippi, that allow a conviction to rest solely on the uncorroborated testimony of an accomplice, accomplice testimony is considered inherently less reliable than that of other witnesses. The United States Court of Appeals, District of Columbia Circuit, briefly explained why in *United States v. Lee*, 506 F.2d 111, 120 (D.C. Cir. 1974):

> As to the basis of the doctrine, there is language in some suggesting that its root lies in the witness's own impairment by his self-incrimination. This kind of rationale harks back to old doctrines that made felons and the accused, incompetent as witnesses, but has little force today. In terms of current realities, the thought should be turned the other way around, for . . . an accomplice's own confession of the soul carries a ring of the truth and it is, indeed, this circumstance that impels the court to caution the jury of the dangers of accomplice testimony. The need for careful scrutiny of an uncorroborated accomplice reflects the danger, underscored by experience, that he may be giving a false account to secure lenient treatment.

> The prospect of immunity or leniency is usually denied, and may not exist; but its existence is always suspected. And so even though there is no testimony in the particular record that the accomplice is testifying out of a prospect of leniency or immunity, the probability that accomplices as a class are likely to do so warrants the cautionary instruction as a reflection of general judicial experience–when the accomplice is uncorroborated.

(Inner quotations and citations omitted).

¶78. Like Mississippi, *Lee* holds that, where there is sufficient material corroboration of an accomplice's testimony, the matter should be put to the jury with the general instruction on credibility of witnesses. *Id*. at 120; *see also* **Head v. State**, 44 Miss. 731, 754 (1870), *overruled on other grounds by* **Smith v. State**, 58 Miss. 867 (1881), (instructing that a cautionary accomplice instruction is inapplicable where the accomplice's testimony is supported in material parts by testimony from another disinterested witness). "Otherwise, a

cautionary instruction against the accomplice tilts against believing the accomplice even when he has been largely corroborated." *Lee*, 506 F.2d at 120. On the other hand, whenever there is doubt as to the sufficiency of the corroboration, judicial prudence points toward giving a cautionary instruction. *Id*. Such matters, however, are for the judge's informed discretion, as "[t]he extent of corroborative evidence required to alleviate the need for a cautionary instruction cannot be measured with mathematical precision." *Id*; *see also Green v. State*, 456 So. 2d 757, 758 (Miss. 1984) ("the trial court has broad discretion in deciding whether to grant a cautionary instruction regarding the testimony of an accomplice").

¶79. Here, for reasons mentioned above, the trial court would not have been in error had it not granted a cautionary accomplice instruction. But the trial court in its discretion did grant an instruction. And having done so, I agree with Justice Maxwell that we cannot hold the trial court in error for giving an instruction that, for the most part, tracked the language of a cautionary instruction approved by a majority of this Court in *Williams v. State*, 32 So. 3d 486, 494-95 (Carlson, P.J., specially concurring).

¶80. I cannot join Justice Maxwell's separate opinion fully, however, as I have no problem with the majority's suggested instruction. But I would not mandate a fixed form. "If the jury is duly cautioned as to the testimony of an accomplice, the law is satisfied." *Wilson v. State*, 71 Miss. 880, 16 So. 304, 305 (1894).

**LAMAR AND COLEMAN, JJ., JOIN THIS OPINION. RANDOLPH, P.J., AND MAXWELL, J., JOIN THIS OPINION IN PART.**